# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ATLANTIC SPECIALTY INSURANCE     *
COMPANY     *

                *        Civil Action No. CCB-19-3194

        v.          *

                *

THE GENERAL SHIP REPAIR CORP.     *

                *

                *

*****

## MEMORANDUM

This matter comes before the court upon defendant The General Ship Repair Corporation's motion for summary judgment, which argues primarily that the plaintiff's negligence claim should be barred by the maritime economic loss rule. (ECF 24, Mot. Summ. J; ECF 27 Suppl. Mot. Summ. J.). Plaintiff Atlantic Specialty Insurance Company responded in opposition (ECF 28, ASIC's Opp'n GSR's Mot. Summ. J.), and GSR replied (ECF 29, Reply Opp'n Mot. Summ. J.). The motion for summary judgment has been fully briefed,[1] and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons stated herein, the court will grant the motion.

## FACTS

MISS T is a tugboat. In September and October of 2016, the General Ship Repair Corp. ("GSR") submitted and revised a proposal to work on MISS T. (ECF 27, Exhibits A, B). The contract included the following:

- Drydocking MISS T (hauling her out of the water to a service yard and putting her on blocks) ($4,500)
- Polishing MISS T's propellers ($1,432)

---

[1] ASIC's motion for leave to file a surreply (ECF 30) to supplement its opposition will be denied. GSR may have cited additional case law, but it did not offer any new evidence or introduce any new legal theories in its reply. *See Clear Channel Outdoor, Inc. v. Mayor & City Council of Baltimore*, 22 F. Supp. 3d 519, 529 (D. Md. 2014) (denying a litigant's leave to file a surreply where the opponent's reply brief arguments were merely responses to arguments the litigant made in its response brief).

- Pumping and cleaning MISS T's bilges, where oily sludge can accumulate ($4,920)
- Blasting (essentially, power-washing) MISS T, including removing various fixtures to allow access and reinstalling new bow fenders ($18,480)
- Painting MISS T ($6,477)
- Renewing zincs: Removing existing weld on zinc anodes and installing new weld. ($143 each)
- Repairing any wasted steel before repainting ($10 to $15 per pound)
- Cleaning the aft void, where oil had accumulated ($748)
- Repairing two doors and a door frame ($375)

(ECF 27-1, Exhibit B, ¶¶ 1, 4–9; ECF 28-4, Exhibit 4 at 5, 6). The contract included the following red-letter clause: "Any suit against us must be filed . . . within one year of completion of work." (ECF 27, Exhibit A at 4). MISS T's owners, who are insured by Atlantic Specialty Insurance Company ("ASIC"), accepted the proposal on October 7. (*Id.* at 3). Ultimately, GSR performed and billed for all of those contract items except for the steel repairs. (ECF 28-4, Exhibit 4 at 10 ¶ 9). ASIC initially characterized this work as an "overhaul" of the vessel (ECF 17, Am. Compl. at ¶¶ 8, 9, 15, 16, 20, 21, 25) but now expressly describes the contract as one for painting and zinc renewal rather than one for building or overhauling the entire vessel (ECF 28 at 2). GSR completed the work, returning MISS T from the GSR shipyard on November 4, 2016. (ECF 24-1 at 2).

Nine days later, on November 13, 2016, MISS T sank at Hawkins Point, Baltimore. (*Id.*). The tug has three void compartments under its deck, each served by two watertight deck hatches — one on the port (left) side and one on the starboard (right) side. (ECF 28-1, Exhibit 1). Each hatch has a single central handle (a "dog") that, when tightened ("dogged down"), creates a watertight seal against a gasket. (ECF 28-2, Exhibit 2 at 27–28). Because MISS T often worked with her decks awash, these deck hatches were crucial: If they were not dogged down tight, the void compartments might fill with water and cause MISS T to sink (ECF 28-3, Exhibit 3 at 15–

16). This is precisely what happened. MISS T arrived at GSR's yard with dogged-down, watertight hatches but was not seaworthy when she left GSR. (ECF 28, Exhibit 2 at 48–49; Exhibit 3 at 45–46; Exhibit 5 at 87). At least one of the deck hatches had no gasket when MISS T left GSR's yard (ECF 28, Exhibit 3 at 42, Exhibit 7).

ASIC claims that, while GSR personnel and MISS T's ownership (through its representative, Mr. Peter Barry) had general discussions about the deck hatches' poor condition, GSR did not specifically advise Mr. Barry that the hatches were not watertight or that they had no gaskets (ECF 28, Exhibit 2 at 25–26, 32–33, 42–43; Exhibit 5 at 55). GSR disputes this fact, noting that three GSR employees testified to the contrary: Mr. Barry was "adamant" about not having any change orders (as would be necessary to fix the hatches) modifying the contract, and he said that his team would take care of the hatches and change the gaskets upon MISS T's return from GSR's shipyard. (ECF 29-1, Exhibit C at 29:17-18; Exhibit D at 23:4-13, 25:3-7, 56:3-15, 58:8-10; Exhibit E at 37:11-16, 42:17-43:2, 43:18-44:6, 55:5-16).[2]

After MISS T sank, ASIC approved repairs including:

- Salvaging and refloating MISS T ($44,700)
- Pollution control and Debris clean-up/containment ($14,347)
- Engine repairs ($108,323)
- Marine chemist ($650)
- Wheelhouse navigation equipment and electronics parts ($17,724)
- Labor, subsistence, and expenses for wheelhouse repairs ($7,967)
- Grating replacement ($2,529)
- Cushions and upholstery ($1,075)
- Engine room and wheelhouse insulation ($900)
- Marine oil replacement ($1,512)

(ECF 28-6, Exhibit 6 at 5–6). ASIC paid $192,018 to MISS T's owners and filed this suit on November 4, 2019, seeking to recover that amount from GSR "not to repair a defective paint job

---

[2] This dispute, however, is not material to the legal issue on which the court must rule.

or failure of the zincs GSR contracted to fix, but for damage" to "MISS T's equipment and associated costs of related repairs and replacements." (ECF 28 at 6). ASIC's negligence, breach of contract, and breach of warranty claims all seek "damages related to the Vessel's engines, equipment, electronics, salvage and refloating operations, pollution control and clean-up, and other related charges." (ECF 17 ¶¶ 17, 22, 27).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

A contract to repair a vessel is a maritime contract. *Dann Marine Towing LC v. General Ship Repair Corp.*, 31 F. Supp. 3d 743, 745–46 (D. Md. 2014). In an admiralty case, the court applies the federal maritime law and can look to state law when federal maritime law is silent. *Id.* Interpretation of a maritime contract's terms is a matter of law. *Id.*

## ANALYSIS

### I.   Tort claim

The core dispute under Count I is whether ASIC may recover in tort for purely economic damages to parts of MISS T that ASIC argues are outside the scope of the contract and that GSR argues are within. The court finds that the contract covered the vessel as a whole, bringing ASIC's tort claim under the maritime economic loss rule.

Under admiralty law, the economic loss rule generally prevents a party from recovering in tort when a defective product harms only the product itself, no matter whether the plaintiff states the action in negligence or strict liability. *See East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 871 (1986) (barring product liability recovery against the manufacturer where defective turbines on a boat damaged only themselves). The rule is born of the Court's concern that contract law not "drown in a sea of tort" and a preference that, when an enforceable contract exists, the parties resolve their disputes based on that relationship rather than framing contract claims as torts. *Id.* at 866, 871–75. Where the only injury is economic loss, the purchaser and the manufacturer can set the terms of their expectations through negotiations, contract provisions, price adjustments, and insurance. *See Sea-Land Serv. Inc. v. Gen. Elec. Co.*, 134 F.3d 149, 155 (3d Cir. 1998).

Though the Fourth Circuit has not yet spoken authoritatively on the matter, the Fifth Circuit has extended this bar from manufacturing contracts to contracts for professional *services*

related to manufacture or construction. *Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752, 766 (5th Cir. 1989). The Fifth Circuit has further extended the bar to a defendant who provided *repair* services rather than construction or manufacturing services as in *East River*. *Nathaniel Shipping, Inc. v. General Elec. Co., Inc.*, 932 F.2d 366, 368 n.3 (5th Cir. 1991) (noting that to draw such a distinction would be inconsistent with *Suwannee River* and would undermine efficient risk allocation through contract, absent public policy concerns that justify tort duties); *see also Smith Maritime, Inc. v. L/B KAITLIN EYMARD*, 710 F.3d 560, 563 (5th Cir. 2013) (likewise extending *East River*'s tort bar to services for *modification* of a vessel, not just manufacture/construction/repair).

This bar against recovery does not apply where the plaintiff sues for injuries to people or for damages to "other property" that was added later but was not part of the product that itself caused physical harm. *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 884–85 (1997). In *Saratoga*, the ship manufacturer's defectively designed hydraulic system caused an engine room fire that sank the ship and destroyed the second owner's equipment (fishing nets, spare parts, a skiff), which the prior owner of the ship had added after purchasing it from the manufacturer. *Id.* at 877–78. The second owner, who experienced the fire and resultant injuries, could recover for the hydraulic system's damage to the additions — the "other property." But he could not recover for the hydraulic system's damage to the rest of the vessel itself, because the entire vessel (including the hydraulic system), as placed in the stream of commerce by the manufacturer, was the "product" that had caused the harm. *Id.* at 883–84. In considering the question of what constitutes "other property" and what is "the product," other courts[3] have

---

[3] Federal maritime law is not silent on this question, so the court need not inquire into Maryland state law on the "other property" exception to the economic loss rule. Maryland courts have acknowledged the complexity of settling "other property" status when a component injures a

looked to the object of the contract or the bargain governing the parties' rights — for example, finding that *East River* barred tort action where the "object of the contract" was the completed vessel and not just the component parts of the vessel. *Smith Maritime*, 710 F.3d at 563–65 (citing *Shipco 2295, Inc. v. Avondale Shipyards Inc.*, 825 F.2d 925, 928 (5th Cir. 1987)).

The reasoning in *Federal Ins. Co. v. Mathews Bros., LLC* is instructive. 2015 WL 4879194 at *1 (D. Md. 2015).[4] There, the vessel's manufacturer contracted with a company to install a fuel cooler discharge line. Two owners later, that contractor's shoddy work led to a seawater leakage, causing the boat to sink and require repairs totaling over $750,000. The owner's insurance company sued the manufacturer as well as the contractor whom the manufacturer had hired to do the relevant installation work. *Id.* at *1–*2, *6. According to the court, the damages Federal sought to pay for repairs arose "only from damage to the vessel itself, not from damage to any persons or other property." *Id.* at *6. The court found that the bar applied, even though the locus of negligence was in the contractor's installation service rather than in the manufacturer's construction of the boat. *Id.* (citing *Suwannee River*, 866 F.2d at 755, 767). "Any alleged negligence in this case stemmed from services performed during the construction" of the boat; the defendants "had contractual obligations, but no independent tort obligations when the vessel injured itself. Plaintiff does not allege any damage other than that to the vessel, which is the product itself." *Id.* at *7. The court dismissed the negligence claims against both the manufacturer and the contractor, finding that the object of the contract was the vessel itself, and damage to the vessel was not damage to "other property."

---

whole. *See, e.g.*, *Pulte Home Corp. v. Parex, Inc.*, 923 A.2d 971, 1003–05 (Md. 2007) (pointing to the property's character as an "integrated whole" or part of the finished product when considering whether Maryland's "other property" exception applied).

[4] Unpublished opinions are cited for the soundness of their reasoning, not for any precedential value.

GSR's motion for summary judgment primarily concerns the reach of the *East River* maritime economic loss rule. GSR argues that the rule should bar ASIC's negligence claim, because the alleged tortious conduct "derives exclusively from the overhaul work being performed on" MISS T. (ECF 24-1 at 9). ASIC's tort claim, GSR argues, alleges no bodily injury or damage to anything other than MISS T, and so the claim is an attempt to smuggle contract claims into court past the red-letter clause's one-year cutoff.

ASIC responds: GSR was negligent, and MISS T sank as a result; therefore, GSR is liable for damage to MISS T's electronics/wiring, navigation equipment, engines and other lost or damaged equipment, as well as for related salvage and pollution prevention costs. This recovery, ASIC argues, is not barred by the maritime economic loss rule, because it concerns neither the subject of the maritime contract (according to ASIC, MISS T's paint job and zinc anodes) nor the parts of the boat that were the loci of the alleged negligence (the hatches and gaskets); any "other" parts of the boat (e.g., the electronics) damaged due to GSR's alleged negligence were outside the scope of the contract and are therefore the reasonable subject of a tort action.

To begin with, the economic loss rule reaches a contract like the one between GSR and MISS T's ownership. While the *East River* bar originated with suits against manufacturers or service contractors involved in a vessel's construction, the Fifth Circuit persuasively extends the bar to repair and modification services. *Nathaniel Shipping*, 932 F.2d at 368 n.3; *Smith Maritime*, 710 F.3d at 563. ASIC seeks to recover only direct economic losses, which generally may be recovered through enforceable contracts rather than through tort law. The essential dispute between the parties is whether the injuries happened to "other property" outside the scope of the contract, thus placing the tort claim outside the *East River* bar.

The answer to that question starts with understanding the object of the contract, an inquiry that leads the parties to argue over whether the contract was for a vessel overhaul or merely for a paint job and renewed zinc anodes. The contract reveals a scope of work beyond ASIC's minimal characterization: On top of hauling MISS T out of the water and putting her on blocks, GSR engaged in various forms of pumping, cleaning, removing, replacing, painting, and polishing that reached all corners of MISS T.  The contract contemplated (and, based on the contract's terms, the parties negotiated over) activity throughout the entire vessel, not just painting and zinc renewal or some other single, discrete unit. MISS T as a whole was the subject of this repair services contract, and so economic damages to MISS T — even damages to her electronics, not mentioned by name in the contract but still part of the contract's overall subject — arising from any alleged negligent repair cannot be considered damage to "other property." This action belongs in the world of contract, not tort.[5] The maritime economic loss rule bars recovery here as a matter of law. There being no genuine dispute of fact material to this question, ASIC's negligence claim must fall.

---

[5] The court notes that ASIC's complaint outlined precisely the same damages in its tort claim as in its time-barred breach of contract and breach of warranty claims: "damages related to the Vessel's engines, equipment, electronics, salvage and refloating operations, pollution control and clean-up, and other related charges." (ECF 17 ¶¶ 17, 22, 27). While this fact is not dispositive, it does raise to mind the Supreme Court's note that when "a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong." *East River*, 476 U.S. at 871.

**II.     Contract claims**

GSR argues that ASIC's contract claims are time-barred by the contract's red-letter clause, which required any suit to be filed within one year of the completion of work: November 4, 2017. (ECF 24-1 at 7; ECF 27-1, Exhibit B at 4). This suit was filed on November 4, 2019. ASIC consents to dismiss its contract claims, Counts II (Breach of Contract) and III (Breach of Warranty of Workmanlike Performance). (ECF 28 at 2).

<strong>CONCLUSION</strong>

For the reasons discussed above, the court will grant GSR's motion for summary judgment. A separate Order follows.


9/29/2021                                                                    /s/
_____                                    _____
Date                                                                      Catherine C. Blake
                                                                          United States District Judge